UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| D6 LLC § | |
| § | |
| v. § | CIVIL NO. 4:24-CV-754-SDJ |
| § | |
| OCTAVIO VICTAL, ET AL. § | |

### MEMORANDUM OPINION & ORDER

Before the Court are Defendant Octavio Victal's 12(b)(2) Motion to Dismiss, (Dkt. #16), and Motion to Quash, Motion for Protection, and Motion to Stay, (Dkt. #27). In his motion to dismiss, Octavio claims that the Court lacks personal jurisdiction over him. Octavio's other motion seeks to stay discovery until the Court rules on his motion to dismiss. Because the Court has specific jurisdiction over Octavio, his motions will be denied.

### I. BACKGROUND[1]

Plaintiff D6 LLC is a food-products manufacturer headquartered in Sulphur Springs, Texas. It sells environmentally friendly, made-to-order packaging and containers from a recycled material called thermal clean washed flake ("TCWF"). Defendants Octavio Victal and Juan Pablo Victal are Mexican citizens who own and manage three entities[2] (collectively, "Green Impact") that purportedly manufacture high-quality TCWF. The parties' dispute relates to a TCWF supply agreement.

---

[1] Unless stated otherwise, the facts in this section are presented as alleged by D6 in its Amended Complaint, (Dkt. #11), and in the Declaration of its president Edward Dominion, (Dkt. #22-1).

[2] All three entities are Defendants in this matter: Green Impact Plastics, S.A. de C.V.; Green Impact Manufacturing, LLC; and Green Impact, LLC.

1

In 2021, D6 agreed to manufacture a large volume of custom food packaging for one of its major customers. As part of the agreement, D6's TCWF manufacturing process had to comply with certain regulatory standards. Relevant here, D6 had to procure TCWF from suppliers that complied with FDA's and EPA's applicable food-packaging standards. Because of the size and scope of this new agreement, D6 sought out an additional TCWF source. Its agreement with Green Impact followed.

From late 2021 through February 2022, D6's representatives—including its president—met repeatedly with Octavio and Juan Pablo to discuss a TCWF supply agreement. From D6's perspective, Green Impact had to meet two requirements. First, Green Impact had to have the capacity to produce enough TCWF at the specified quality. Second, its facilities and manufacturing process had to comply with the relevant regulatory standards. If Green Impact couldn't meet either requirement, a supply agreement would be a nonstarter.

Octavio made several representations during the parties' negotiations to alleviate D6's concerns:

- Green Impact's warehouse[3] in El Paso, Texas, could collect and process enough used food-packaging material to meet D6's needs.
- Green Impact's recycling facility in Juarez, Mexico (the "Juarez Facility"), had sufficient equipment to manufacture the specified TCWF.
- The Juarez Facility complied with the relevant FDA and EPA regulations, including properly handling and disposing toxic chemicals used during recycling.

---

[3] While Octavio denies that Green Impact has a warehouse in El Paso, Texas, the Court must "resolve all controverted allegations in [D6's] favor." *Diece-Lisa Indus. v. Disney Enters.*, 943 F.3d 239, 249 (5th Cir. 2019). Therefore, for purposes of this motion, the Court finds that Green Impact has a warehouse in El Paso, Texas.

2

- The law firm of Keller & Heckman, LLP visited Green Impact's warehouses/facilities at Octavio's request and issued two opinion letters deeming its operations FDA compliant (the "FDA Compliance Letters").

Octavio made many of these representations during the parties' in-person negotiations at D6's headquarters in Sherman, Texas. In fact, Octavio admits that he traveled to Texas repeatedly to solicit D6's business. *See* (Dkt. #16 ¶ 26) (Defendant's Answer Subject to This Motion to Dismiss). Octavio also negotiated with D6's Sherman representatives by email and by phone. D6 alleges, and Octavio does not contest, that he was at Green Impact's warehouse in El Paso, Texas, for these negotiations. According to D6, Octavio emailed the FDA Compliance Letters to D6's representatives from El Paso. And he participated in multiple telephonic conferences with D6 from there too, seeking to reinforce Green Impact's capabilities and regulatory compliance.

In the end, D6 entered into an agreement with Green Impact. But before agreeing to a long-term contract, the parties decided to do a trial run. D6 shipped over a million pounds of used material to Green Impact's El Paso warehouse, pre-paid for about $250,000 of TCWF, and sent purchase orders to establish a delivery schedule. Green Impact was then supposed to ship those materials to the Juarez Facility, manufacture compliant TCWF, and ship it back to El Paso for D6 to pick up.

Green Impact failed to do so. To be sure, D6 admits that Green Impact did deliver some TCWF during the trial period. But it was less than D6 paid for and of such low quality that D6 couldn't use it. Indeed, the contaminant levels far exceeded D6's specifications. As a result, D6 began to worry that Green Impact could not perform its duties under their agreement.

So D6's representatives traveled to the Juarez Facility to inspect operations. They quickly discovered that Octavio had made several misrepresentations during their negotiations. For example, the facility did not appear to have the right equipment to manufacture the specified volume or quality of TCWF. They also observed numerous EPA and FDA violations during the visit, including workers dumping toxic chemicals into the surrounding groundwater. And in the months that followed the facility inspection, D6 uncovered that the FDA Compliance Letters were fake. The attorneys from the firm that allegedly prepared them confirmed that the FDA Compliance Letters were doctored and that they had never prepared any such letters for Green Impact. (Dkt. #22-1 ¶¶ 8–9). Octavio offers nothing to controvert that he made any of these misrepresentations, or, for that matter, that any of D6's allegations are false.

After unsuccessfully seeking the return of over a million pounds of used packaging materials, D6 sued Green Impact in Texas state court. It brings claims for breach of contract, conversion, fraudulent inducement, and negligent misrepresentation. Shortly after the case was removed to this Court, Octavio moved to dismiss the case under Rule 12(b)(2). While that motion was pending, Octavio moved to stay all discovery against him until his 12(b)(2) motion was decided. Both motions are fully briefed and ripe for resolution.

## II. LEGAL STANDARD

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's

4

jurisdiction over the nonresident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citations omitted). Absent an evidentiary hearing, a plaintiff must "present sufficient facts as to make out only a prima facie case supporting jurisdiction." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000) (citation omitted). Courts must also accept as true all "uncontroverted, non-conclusory factual allegations and resolve all controverted allegations in its favor." *Diece-Lisa Indus. v. Disney Enters.*, 943 F.3d 239, 249 (5th Cir. 2019). Once the plaintiff has established personal jurisdiction, the burden shifts to the defendant to present some reason that "would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

"In a diversity action, personal jurisdiction may be exercised over a nonresident defendant if: (1) the nonresident defendant is amenable to service of process under the law of the forum state; and (2) the exercise of jurisdiction under state law comports with the due process clause of the fourteenth amendment." *Stuart*, 772 F.2d at 1189. The first inquiry depends on the reach of the forum state's long-arm statute. *Id.* The Texas long-arm statute authorizes the exercise of personal jurisdiction to the limits of federal due process. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (authorizing jurisdiction over those "doing business" in Texas); *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990) (citing *U-Anchor Advert. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)) ("This court has decided that the broad language of the long-arm statute's doing business requirement allows the statute to reach as far as the federal constitution permits."). Accordingly, the analysis under the Texas long-

arm statute is identical to the federal constitutional analysis.

Due process is satisfied when a court finds that a defendant has "minimum contacts" with the forum state such that exercising personal jurisdiction over the defendant would not offend "traditional notions of fair play and substantial justice." *See Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The minimum-contacts requirement can be satisfied by conduct that gives rise to either general or specific jurisdiction.[4] *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867–68 (5th Cir. 2001) (citing *Alpine View*, 205 F.3d at 214).

Specific jurisdiction relates to the claims brought against the defendant and his relationship to the forum state. As the Fifth Circuit has noted, "[s]pecific jurisdiction exists when two circumstances are met: (1) 'a nonresident defendant has purposefully directed its activities at the forum state,' and (2) 'the litigation results from alleged injuries that arise out of or relate to those activities.'" *Diece-Lisa Indus.*, 943 F.3d at 250 (citations omitted). Although "random, fortuitous, or attenuated" activities are insufficient, *id.*, "isolated or sporadic contacts" may suffice if the claim "relates to or arises out of those contacts," *ITL Int'l v. Constenla, S.A.*, 669 F.3d 493, 499 (5th Cir. 2012).

If minimum contacts are established, courts must then consider whether the exercise of jurisdiction would be fair and reasonable. *Burger King*, 471 U.S. at 476. To make that determination, the court may consider "the burden on the defendant,

---

[4] Because the Court finds that it has specific jurisdiction over Octavio, it need not reach (or discuss) whether it also has general jurisdiction over him too.

6

the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Id.* at 477 (citation modified). But if minimum contacts have been established, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.*

### III. DISCUSSION

The Court first considers whether D6 has made a prima facie case supporting jurisdiction over Octavio. After finding that it has, the Court considers whether the exercise of jurisdiction over Octavio is fair and reasonable.

We begin with purposeful availment. D6 provides more than enough to plausibly allege that Octavio purposefully availed himself of the privileges of conducting business in Texas. Octavio *repeatedly* traveled to Sherman, Texas, to participate in negotiations that led to the parties' TCWF supply agreement. Octavio continued to negotiate with D6's Sherman representatives from El Paso through calls and emails. All of Octavio's alleged misrepresentations were made while Octavio was in either Sherman, Texas, or El Paso, Texas. And they were made to D6 representatives in Sherman, Texas.

The Fifth Circuit's specific-jurisdiction precedent is strong medicine: "A single act by the defendant directed at the forum state . . . can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas Turbines,*

7

*Inc. v. Donaldson Co.*, 9 F.3d 415, 419 (5th Cir. 1993). The same holds true for tortious acts committed in the forum state. *See Carmona v. Leo Ship Mgmt.*, 924 F.3d 190, 194 (5th Cir. 2019) (noting that "the defendant's commission of a tort while physically present in a state will readily confer specific jurisdiction"); *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 491 (5th Cir. 2018) (holding that a defendant who was "a willing participant on a conference call" and who "actively engaged in conversation" in which he made specific representations regarding his business to an individual in Texas had the requisite contacts with Texas to establish specific jurisdiction for the fraud claims); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) ("When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment.").

Octavio's misrepresentations about the Jaurez Facility's capacity, equipment, and regulatory compliance were made when he was in Texas and were made to D6's Texas representatives in Sherman. These misrepresentations are uncontroverted by Octavio. Nor does he contest his physical presence in Sherman, Texas, for the business negotiations in which he made these misrepresentations. Because "the actual content of [Octavio's] communications with [this] forum give[] rise to intentional tort causes of action"—here, fraudulent inducement—"this alone constitutes purposeful availment." *Id.* at 213. The Court therefore finds that D6 has satisfied the purposeful availment prong.

The second prong is easily satisfied too. D6's alleged injuries—the losses it sustained from contracting with Green Impact—"arise out of" Octavio's repeated

misrepresentations about his companies and their capabilities. *Diece-Lisa Indus.*, 943 F.3d at 250 (citations omitted). And those misrepresentations form the basis for several of D6's claims, including fraudulent inducement and negligent misrepresentation. Therefore, this litigation "results from alleged injuries that arise out of or relate to [Octavio's misrepresentations]," *id.*, which were made while he was in Texas and were directed at Texas citizens.

In short, D6 has plausibly alleged that this Court has specific jurisdiction over Octavio. *See Carmona*, 924 F.3d at 194 ("[T]he defendant's commission of a tort while physically present in a state will readily confer specific jurisdiction.").

As a result, the burden of proof over jurisdiction shifts to Octavio to rebut D6's prima facie case for specific jurisdiction. *Burger King*, 471 U.S. at 477. Outside of reciting the general contours of specific jurisdiction, however, Octavio offers only a single, cursory paragraph to contest this Court's specific jurisdiction:

> To the extent Plaintiff claims that this Court has specific jurisdiction over Octavio, its assertion is not supported by the facts. Octavio was not a party to any agreement from which Plaintiff's claims are derived, and otherwise has insufficient contacts with Texas in his individual capacity to support jurisdiction. Further, Plaintiff's Original Petition fails to specify any claims that arise out of or relate to any purposeful contacts Octavio has had with Texas. Because there is no substantial connection between Octavio and the transactions giving rise to this litigation, the Court lacks specific jurisdiction. Accordingly, the Court lacks specific personal jurisdiction over Octavio, and Plaintiff's claims against him should be dismissed.

(Dkt. #16 at 6–7) (citation modified). While the Court finds this conclusory response unpersuasive, one point merits clarification. Octavio need not be party to any agreement from which D6's claims are derived. Indeed, "corporate officers are not shielded from exercise of specific jurisdiction *for fraudulent or tortious acts* for which

9

they may be liable." *N. Tex. Opportunity Fund L.P. v. Hammerman & Gainer Int'l*, 107 F.Supp.3d 620, 630 (N.D. Tex. 2015). That is so because "[a]n officer is individually liable for any tortious conduct that he committed in connection with his corporate duties." *Walker v. FDIC*, 970 F.2d 114, 122 (5th Cir. 1992). D6's uncontroverted allegations that Octavio—one of two owners of Green Impact—committed tortious misrepresentations in Texas while negotiating an agreement on behalf of Green Impact are more than sufficient.

To be sure, litigating in Texas may impose some inconvenience or expense on Octavio. But the law in this Circuit is clear: When a nonresident engages in even "a single isolated transaction in a state and a tort claim arises out of that activity, the state may assert jurisdiction over the non-resident . . . without contravening due process." *Eyerly Aircraft Co. v. Killian*, 414 F.2d 591, 597 (5th Cir. 1969) (citations omitted). The Court therefore finds that it may exercise specific jurisdiction over Octavio consistent with due process.

## IV. CONCLUSION

For these reasons, it is therefore **ORDERED** that Defendant Octavio Victal's 12(b)(2) Motion to Dismiss, (Dkt. #16), is **DENIED**.

It is further **ORDERED** that Victal's Motion to Quash, Motion for Protection, and Motion to Stay, (Dkt. #27), is **DENIED as moot**.

So ORDERED and SIGNED this 6th day of August, 2025.

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE